## Allen v. Montgomery Hospital

*John V. Hasson,* for plaintiffs.
*John R. Warner,* for defendant Montgomery County.
*William Pugh IV,* for defendant Paul R. Casey M.D.

OTT, *J.,* June 11, 1991—

## PROCEDURAL HISTORY

This case was called for trial on December 6, 1990. At that time all counsel agreed that a ruling on the joint motion in limine of defendants Montgomery Hospital and Paul R. Casey Jr., M.D., that the Mental Health Procedures Act* be applied as the law of the case was critical to the proceedings. We therefore granted all counsel additional time to prepare memorandums of law and requested that they attempt to prepare a joint stipulation of facts to be used in the determination of the applicability of the limited immunity provision of the Mental Health Procedures Act. A stipulation as to relevant facts was filed and oral argument was held on March 26, 1991. Because we are of the opinion that the attached order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from that order may materially advance the ultimate termination of the matter, this court has agreed to certify the issue to Commonwealth Court pursuant to 42 Pa.C.S. §702(b).

## FACTS

Nancy Allen was admitted to Norristown State Hospital on August 11, 1980. Prior to her admission she had been treated by psychiatrists at various institutions for mental retardation and psychosis. While Nancy was a patient at Norristown, her mental deficiencies were treated with various psychotropic medications. Improvement in her mental status was sought by enrolling Nancy in a special progress school at Norristown. During the month of November 1982, while at Nor-

---

* Act of July 9, 1976, P.L. 817, No. 143, §101, 50 P.S. §7101 et seq.

ristown, Nancy became very agitated and exhibited behavior such as crying, rolling on the floor, hitting other patients and screaming. Her condition was treated with various medications including Vistaril, by placing her in a "side" or "security" room, and by placing her in various restraints, including a "posey" restraint. Toward the end of November 1982, Nancy experienced health problems including fever, dehydration and possible urinary tract infection. On the morning of November 30, 1982, Nancy was transferred from Norristown to the emergency room of Montgomery Hospital for treatment of these physical ailments.

Upon her transfer to Montgomery Hospital her mental status was reported by her treating psychiatrist, Onward Szeto, M.D., as being "severely mentally retarded with very little cognitive function. Her speech is incoherently (sic) and she is not orientated (sic) in time, place and person. She could not be engaged in any meaningful communications. The diagnosis is mental retardation, profound with psychosis."

At the time of her transfer, Nancy was accompanied by Norristown information sheets which indicated her condition as being "dehydrated, cannot swallow, muscular rigidity, rule out toxicity." When admitted to the emergency room Nancy was seen by Dr. Casey, an internist. Dr. Casey was her attending physician while she was a patient at Montgomery Hospital.

The nursing admission assessment dated November 30, 1982, at 3 p.m. contained the following observation: "Awake, not apparently oriented times three; non-communicative; patient can become combative at times; posey needed at all times."

Dr. Casey admitted Nancy to room 449 on the orthopedic floor where she was the only mental patient.

Various medications were ordered for Nancy including Vistaril, a psychotropic drug prescribed for agitation.

During the 3 to 11 p.m. nursing shift on November 30, 1982, a vest type posey restraint was placed on Nancy for her safety. The restraint was put around the chest area with two straps on each side which were tied to the rails of Nancy's bed. The restraint remained on Nancy with the exception of when she received back care and when her clothes and bed were changed. Although there was no physician's order authorizing the initial or continued use of the restraint, Dr. Casey and his partner Dr. Belasco intended Nancy to remain in it throughout her hospitalization.

At approximately 2 a.m. on December 5, 1982, nurse Patricia Seneko found Nancy half-on and half-off her bed at its foot with the arm of the restraint entangling her head and binding her neck. The straps of the restraint were still tied to the bed rails and Nancy was suspended by the posey restraint wrapped around her neck. Nancy's left arm was still in the armhole of the restraint although she had worked her right arm free. Nurse Seneko ran down the hall and secured help from the nurses' station. Nurse Hunsberger untied the restraint, CPR was initiated and an emergency code was signalled. The effect of the entanglement of the posey restraint was strangulation and loss of oxygen. Consequently, Nancy sustained hypoxic encephalopathy resulting in permanent brain damage.

Nancy's progress at Montgomery Hospital was monitored by the Nursing Department at Norristown from December 2, 1982, to March 4, 1983, by way of telephone calls and three visits. On December 6, 1982, Onward Szeto, M.D. and Donald M. Twaddell, M.D., Norristown's medical director, visited Nancy at Montgomery Hospital.

On March 4, 1983, Nancy's treatment for dehydration having been completed, she returned to Norristown where she remained as a mental patient except for several interim hospitalizations at another hospital. In October 1990, she was transferred to a private institution.

Suit was filed on Nancy's behalf alleging medical negligence on the part of Montgomery Hospital and Dr. Casey concerning their failure to exercise due care in the manner in which Nancy was treated. Montgomery Hospital joined Norristown State Hospital as an additional defendant.

## ISSUE

Does section 7114 of the Mental Health Procedures Act apply to this case?

## DISCUSSION

In 1976, the Legislature passed the Mental Health Procedures Act to assure adequate treatment for mentally ill persons and to establish procedures to effect this policy. The goal of the Act is to make voluntary and involuntary treatment available where the need is great and its absence could result in serious harm to the mentally ill person or to others. 50 P.S. §7102.

The Act establishes the right and procedures for all mentally ill persons who are treated at a facility. 50 P.S. §7102. "Facility" is defined as any mental health establishment including a hospital which "provides for the diagnosis, treatment, care or rehabilitation of mentally ill persons, whether as outpatients or inpatients." *Id.*

The Act further defines adequate treatment as:

"a course of treatment designed and administered to alleviate a person's pain and distress and to maximize

the probability of his recovery from mental illness.... Adequate inpatient treatment shall include such accommodations, diet, heat, light, sanitary facilities, clothing, recreation, education and medical care as are necessary to maintain decent, safe and healthful living conditions.... Treatment shall include diagnosis, evaluation, therapy or rehabilitation needed to alleviate pain and distress and to facilitate the recovery of a person from mental illness and shall also include care and other services that supplement treatment and aid or promote such recovery." 50 P.S. §7104.

Pursuant to 50 P.S. §7106 a treatment team is required to formulate and review an individualized treatment plan for all persons who are treated under the Act. An individualized treatment plan is defined as a plan "formulated for a particular person in a program appropriate to his specific needs." Such a plan must impose "the least restrictive alternative" available consistent with providing adequate treatment. 50 P.S. §7107. The person under treatment is to be examined and his treatment plan is to be reviewed not less than once every 30 days. 50 P.S. §7108.

In order to promote treatment by the least restrictive means, limited immunity from civil and criminal liability is granted to health care providers who are involved in treatment decisions. 50 P.S. §7114 states in pertinent part:

"(a) In the absence of willful misconduct or gross negligence, a county administrator, a director of a facility, a physician, a peace officer or any other authorized person who participates in a decision that a person be examined or treated under this act, or that a person be discharged, or placed under partial hospitalization, outpatient care or leave of absence, or that the restraint upon such person be otherwise reduced, or a county

administrator or other authorized person who denies an application for voluntary treatment or for involuntary emergency examination and treatment shall not be civilly or criminally liable for such decision or for any of its consequences."

As the Supreme Court of Pennsylvania noted in *Farago v. Sacred Heart Hospital*, 522 Pa. 410, 562 A.2d 300 (1989), mental health personnel render treatment in an "unscientific and inexact field." Limited immunity allows them to provide the statutorily required least restrictive treatment without fear of liability to their patients and others.

Plaintiffs argue that section 7114 does not apply in cases where lack of due care in providing medical treatment is at issue. They maintain that immunity is available only for certain enumerated treatment decisions: the decision to examine or treat a person; the decision to discharge; decisions to place a patient under partial hospitalization, outpatient care or leave of absence and the decision to reduce the restraints upon a person. Since their suit is based on the negligent manner in which Nancy was treated rather than on any of the aforementioned decisions, they claim that the immunity provision is inapplicable. Defendants counter that a decision to treat a person involves much more than the initial decision to provide treatment. They maintain that absent willful misconduct or gross negligence, immunity is provided for the manner in which treatment is administered.

The *Farago* court held that the immunity provision of the Act applies to treatment decisions. There, Mrs. Farago was admitted to Sacred Heart Hospital due to a schizophrenic episode. After initial evaluation by the admitting nurse and a telephone consultation with the on-call psychiatrist, they determined that Mrs.

Farago did not require special observation. Routine orders, including hourly physical checks, were prescribed. Mrs. Farago maintained that on the day of her admission to Sacred Heart's open ward she was raped in the bathroom by a male patient. The Faragos brought suit against the hospital for alleged negligence for failing adequately to supervise and protect Mrs. Farago. At the close of trial the court instructed the jury that a willful misconduct or gross negligence standard should be applied pursuant to the immunity provision of the MHPA. The jury's verdict in favor of Sacred Heart was affirmed by Superior Court and Supreme Court.

The Supreme Court focused its analysis on the fact that Mrs. Farago's admission under routine orders, including hourly checks, constituted a plan of treatment appropriate to her specific needs. Such a plan is mandated by 50 P.S. §7107 (Individualized Treatment Plan). The court noted that under 50 P.S. §7114 immunity is granted to one "who participates in a decision that a person be examined or treated under this act." Because the staff's decision to allow Mrs. Farago to stay in the open ward was a treatment decision, the court determined that it was protected under the immunity provisions.

We recognize that there are factual distinctions between *Farago* and the instant case. While at Sacred Heart Hospital Mrs. Farago was in the psychiatric unit and was treated solely for psychiatric problems. Decisions regarding her treatment were made by mental health professionals including a nurse and an on-call psychiatrist. Nancy Allen was at Montgomery Hospital primarily for treatment of a medical condition but also received treatment for mental illness. This treatment included administering of psychotropic drugs, frequent

observation and the use of restraints. She was assigned a room on the orthopedic floor and was treated by staff members who were not specifically trained in psychiatry. We note the court found that Mrs. Farago's admission under routine orders, including hourly checks constituted an individualized treatment plan pursuant to 50 P.S. §7101. This plan was designed in accordance with the mandate for adequate treatment set forth in 50 P.S. §7104. Similarly we note that the course of treatment fashioned by the Montgomery Hospital staff for Nancy constitutes adequate treatment which 50 P.S. §7104 defines, in part, as including "such ... medical care as (is) necessary to maintain decent, safe and healthful living conditions."

The stated policy of the MHPA is "to seek to assure the availability of adequate treatment to persons who are mentally ill." 50 P.S. §7102. To promote this goal the legislature provided limited immunity to a "person who participates in a decision that a person be examined or treated under this act...." 50 P.S. §7114. When the phrase "treated under this act" is read in conjunction with sections 7104 and 7107 of the MHPA, it becomes clear that immunity is granted for more than just the initial decision to treat. Section 7104 provides that treatment includes "diagnosis, evaluation, therapy, or rehabilitation needed to alleviate pain and distress and to facilitate the recovery of a person from mental illness and shall also include care and other services that supplement treatment and aid or promote such recovery."

Section 7107 states that an individualized treatment plan is a "plan of treatment formulated for a particular person in a program appropriate to his needs." Given the broad definition of treatment and the policy of the Act to make such treatment available it is illogical to limit immunity merely to the decision to admit a person

into treatment. It is the decision to provide a certain course of treatment rather than the mere decision to treat which is afforded immunity under section 7114. We base this conclusion on the *Farago* court's determination that the decision by Sacred Heart Hospital to allow Mrs. Farago to remain on an open ward on one hour watch was a treatment decision which was protected by the immunity provision. Likewise, placing Nancy Allen in a private room and controlling her behavior with medication and restraints was a treatment decision. The health care professionals who made this decision are entitled to immunity from ordinary negligence.

In *McNamara v. Schleifer Ambulance Service,* 383 Pa. Super. 100, 556 A.2d 448 (1989). Superior Court determined that ambulance drivers who were transporting a mentally ill patient from one hospital to another were not entitled to immunity under the Act for their ordinary negligence. Based on the court's reading of section 7102 (Statement of Policy) and section 7103 (Scope of Act), it determined that "the legislature contemplated the decision-making process under §7114 as one which would take place within the context of treatment, care, diagnosis or rehabilitation." *Id.* at 103, 356 A.2d at 449. The court noted that the ambulance attendants had not received any medical training and was especially persuaded by the fact that the attendants were not participating in the patient's treatment. This is in contrast to the instant case where trained medical personnel devised and effectuated a plan of medical treatment for a mentally ill patient. While the *McNamara* court stated that the legislature contemplated that the individuals who would participate in a decision

to treat would be trained in the field of mental health, this seems overly narrow considering the broad statutory definition of treatment. It was precisely due to Nancy's status as a mental patient that an individualized treatment plan consisting of psychotropic drugs, posey restraint and nursing checks was initiated. We believe that granting immunity to the medical professionals who treated Nancy's illness is consistent with the intent of the MHPA.

One of the most important features of the MHPA is the provision that an individualized treatment plan "shall impose the least restrictive alternative consistent with affording the person adequate treatment for his condition." 50 P.S. §7107. The Act recognizes that while the state has a responsibility to protect the mentally ill, it must do so with a minimum deprivation of individual liberty. By extending immunity to authorized persons who make treatment decisions, the Act encourages them to allow patients the maximum amount of freedom. If treatment decisions were not covered by section 7114, the "least restrictive alternative" provision would be hollow indeed. Surely health care providers would eschew the least restrictive alternative if they faced the possibility of legal action in the absence of willful misconduct or gross negligence. When read in conjunction, the least restrictive alternative provision and the immunity provision reflect a legislative choice to favor the mentally ill patient's liberty interest over his ability to recover for mere negligence. Limiting immunity to the decisions to admit, discharge or reduce the restraints on a patient is contrary to legislative intent. We note that the immunity provisions of the MHPA apply to individual health care providers as well as to hospitals where treatment is given. *Farago* at 416-417, 562 A.2d at 303.

As a mentally ill patient, Nancy Allen is a person the Act was intended to protect. Among the protections afforded her is the right to in-patient medical care and treatment including therapy needed to alleviate pain and distress. She is also entitled to care and other services that supplement treatment and aid or promote recovery, 50 P.S. §7104. Both the treatment Nancy received for dehydration and for mental illness qualify as treatment under 50 P.S. §7104. The staffs of Montgomery Hospital and Norristown State Hospital and Dr. Casey were authorized persons who participated in a treatment decision. Therefore, they are entitled to immunity in the absence of willful misconduct or gross negligence.

## ORDER

And now, June 11, 1991, upon consideration of the joint motion in limine of defendants Montgomery Hospital and Paul R. Casey Jr., M.D., the response filed thereto, the memoranda submitted by counsel and following oral argument, the joint motion in limine is granted and the standard of negligence set forth in §7114 of the Mental Health Procedures Act shall be applied as the law of the case.

Because this interlocutory order involves a controlling question of law as to which there is substantial ground for difference of opinion and an immediate appeal therefrom may materially advance the ultimate termination of the matter, permission to pursue and interlocutory appeal to Commonwealth Court pursuant to 42 Pa.C.S. §702(b) is granted.